UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICHARD N. EASLY,

    Plaintiff,

v.

WATERFRONT SHIPPING COMPANY, LIMITED, *et al.*,

    Defendant.

Case No. C10-1167RSL

MEMORANDUM OF DECISION

This matter comes before the Court following a four-day bench trial. Plaintiff Richard N. Easly contends that he was permanently injured when a heavy line was dropped negligently from the deck of the Global Spirit, a tanker ship owned and operated by Defendants. See Dkt. # 32. By the start of trial, Plaintiff had dismissed his claims against all Defendants but one: Fresco Shipping S.A. He seeks to recover damages for lost past and future wages and fringe benefits, anticipated medical expenses, anticipated retraining costs, and his pain and suffering. He also seeks prejudgment interest. The Court awards Plaintiff a net judgment in the amount of $552,120 non-inclusive of pre-judgment interest and directs the parties to file briefs addressing the issue of the appropriate amount of interest.

## FINDINGS OF FACT

All of his adult life, Plaintiff Richard N. Easly has worked on tugs. Fresh out of high school, he went to work for the Knappton Towing Company, working as deck hand. He worked there for nearly eight years, leaving only after he injured his back. In

MEMORANDUM OF DECISION - 1

September 1987, he went to work for the Foss Maritime Towing Company. Within a year, he was promoted to chief engineer—a position he held for the next 22 years. And though he suffered from Type II diabetes, hypertension, and sleep apnea, he did not miss any substantial time until he suffered a right arm injury in 2005.

In April 2008, Foss brought its newest tug, the Pacific Star, into service. Foss asked Plaintiff to oversee that process. He did, working day and night to ensure that the vessel was ready. Afterward, he was assigned to the vessel. As chief engineer, he was responsible for maintaining and repairing the ship's machinery. He was also responsible for retrieving the lines used to tether the tug to ships—a heavy task. It required him to work in cooperation with crewmen from other ships to lower Foss's "head line"—a nine-inch-in-circumference Kevlar line—from the deck of those ships to the deck of the Pacific Star below. This line weighed more than two-pounds-per-foot dry and even more wet. It was attached to the Pacific Star's winch—a large motorized drum used to retrieve and release the line—on one end and a smaller "tag line" at the other. Both of these lines were generally threaded through the tug's "staple," a large metal object welded to the deck forward of the winch.

When the Global Star was assisting a vessel, both lines would first be passed upward to the other vessel. That vessel's crew would secure the head line to one of the vessel's chocks—metal objects welded to the vessel and used for securing lines. The Global Star would then use its winch to eliminate the slack from the line, which would pull it tight to the side of the vessel it was assisting.

When the job was complete, the winch would be used again, this time to give slack to the line. Plaintiff would then take a position on the deck just forward of the staple and work with the other vessel's crew to lower the line. The other crew was supposed to slowly lower the head line down to the Plaintiff, who, taking the rope hand-over-hand, would then "flake" the line over the deck. Under no circumstances, however, was the crew to drop the line to the deck without alerting the Global Star.

MEMORANDUM OF DECISION - 2

Unfortunately, line drops were not a rare occurrence. And, as this case demonstrates, a line drop could carry serious consequences.

After assisting the Global Spirit at the Shell Oil refinery in Anacortes, Washington, on August 20, 2009, the Pacific Star was in the process of retrieving its tether lines. Plaintiff was on the deck of the Pacific Star a foot forward and slightly starboard of the staple. The Pacific Star was nose in to the side of the Global Spirit. The Global Spirit's crew had begun lowering the line down to Plaintiff, who was aware of and in compliance with Foss's policy that crewmen not stand under a line during retrieval. After ten feet of line had been slowly lowered to him, the rest of the line suddenly dropped. It fell straight down, striking the bow of the tug and bouncing into the water. When it hit, the line snapped, landing a blow on the under side of Plaintiff's left arm and jerking his arm forward violently. Plaintiff immediately released the line and cradled his arm. Still, while in pain, he did not know the extent of his injury. He finished coiling the line before reporting the injury to Captain Scott McKinley.[1]

Following his injury, Plaintiff was evaluated by James Joubert at PeaceHealth St. John Medical Center in Longview, Washington. Dr. Joubert found "exquisite pain" when he palpated the left medial epicondyle and moderate pain on palpation of the left lateral epicondyle. Based on the history and examination, Dr. Joubert diagnosed Plaintiff with left lateral epicondylitis and left medial epicondylitis. He referred Plaintiff to occupational therapy, prescribed anti-inflammatory medications to reduce swelling, and prescribed a brace for Plaintiff to wear on his left arm when doing activities with that arm. After two more visits with no improvement, Dr. Joubert referred Plaintiff to get an orthopedic opinion on additional treatment options.

On November 9, 2009, Plaintiff was evaluated by Christine Matthews, a physician's assistant at St. John's InMotion Orthopedic clinic. Ms. Matthews also

---

[1] The injury was not reported to the crew of the Global Spirit.

MEMORANDUM OF DECISION - 3

concluded that Plaintiff suffered from left elbow medial epicondylitis and lateral epicondylitis. She recommended that Plaintiff avoid any maneuvers that made his condition hurt more and gave him a steroid injection to try and reduce the pain and swelling. She noted, however, "I fear he may require epicondylectomy in the near future."

Plaintiff returned to InMotion again on December 18, 2009, and January 29, 2010. He reported that the steroid injection seemed to help somewhat but that he experienced periods of weakness of his left hand. On February 23, 2010, Plaintiff underwent surgery. Dr. Mark Reis, an orthopedic surgeon, operated on Plaintiff's medial and lateral epicondylitis. During surgery, Dr. Reis found an abnormal underlying extensor carpi radialis brevis tendon that had detached at the origin from the lateral epicondyle. After reattaching it, he removed diseased portions of Plaintiff's tendons and drilled holes into the medial epicondyle to encourage healing.

When Plaintiff returned to the clinic for his first post-operative visit on March 3, 2010, Dr. Reis noted decreasing pain and increasing mobility and anticipated an attempt to return to regular duties in approximately six weeks. He referred Plaintiff for physical therapy.

Unfortunately, Plaintiff's improvement was short-lived. When Plaintiff returned to InMotion on March 18, 2010, he reported suffering increased pain. Ms. Matthews noted: "He states he has significant amount of pain in his proximal dorsoradial forearm when he does wrist extension. He states he feels like he is back at square one postoperatively." On March 29, 2010, Plaintiff returned to the clinic "semi-urgently." He told Ms. Mathews that his arm "feels worse than it did preoperatively." She noted, "He cannot participate with the physical therapist well, and I also received a phone call from the physical therapists outlining their concerns about this gentleman."

Concerned that physical therapy might be exacerbating Plaintiff's injuries,

MEMORANDUM OF DECISION - 4

Plaintiff was told to take two weeks off and given anti-inflammatories and pain medications. At his next visit two weeks later, Ms. Matthews noted that Plaintiff's condition had improved since he had stopped physical therapy.

On May 7, 2010, Plaintiff returned to the clinic and was evaluated by Dr. Michael Brown. Dr. Brown noted that Plaintiff was having a "great deal of pain" and was unable to lift anything heavy. He noted that Plaintiff continued to have swelling and decreased grip-strength in the left arm.

On May 18, 2010, Plaintiff was evaluated by Dr. Randall Espinosa. Dr. Espinosa noted that since his surgery Plaintiff's progress had been "very marginal" and he continued to have marked pain.

On June 23, 2010, Plaintiff was evaluated again by Dr. Reis. Dr. Reis noted: "He reports improvement compared with two months or so ago, but persistent pain and stiffness with difficulty achieving full extension and pain which occurs during certain activity." Plaintiff also described a "pins and needles sensation" in his elbow and tenderness in the area when he rested his elbow on hard surfaces. Dr. Reis thought that Plaintiff was making "slow and steady" progress but that it was quite possible that he would not reach maximum medical improvement until six to twelve months after surgery. He thought it best to wait before considering a second surgery.

Plaintiff returned again to Dr. Reis on July 21, 2010. He continued to have pain and a weak hand-grip. Ms. Matthews noted continuing atrophy of his left forearm. Notably, Dr. Reiss also noted a change in Plaintiff's mood and referred him to mental health counseling.

After several more visits to Dr. Reiss, Plaintiff sought out a second opinion. On January 26, 2011, he was evaluated by Dr. Peter L. Kung at Longview Orthopedic Associates, P.L.L.C. Dr. Kung noted decreased grip strength and tenderness directly over his lateral epicondyle. X-rays showed minimal arthritis with some calcifications

MEMORANDUM OF DECISION - 5

along the lateral aspect of the elbow.  Dr. Kung told Plaintiff, "Given the fact that this is almost a year out from surgery, I do not think he is going to get any more improvement with physical therapy . . . .  Again, I discussed with him that he needs to be very realistic, and there is chance that it is as good as it is going to get and that this may be his maximal medical improvement."  Nevertheless, Dr. Kung ordered an MRI to explore potential surgical options.  Reviewing the results, he told Plaintiff that there appeared to be an issue with his tendon, but that it was possible that "his symptoms will not get better."  Weighing the risks, Plaintiff elected to undergo a second surgery.

On March 17, 2011, Dr. Kung removed the portion of Plaintiff's tendon that appeared diseased.  Unfortunately, the surgery seemed only to aggravate Plaintiff's symptoms.  He continued to have pain and weakness in his left arm.  At his last visit on June 22, 2011, Dr. Kung concluded: "I think that Richard has now hit maximal medical improvement."  He later explained that, while Plaintiff's specific symptoms would likely wax and wane in intensity, his overall condition would not likely improve.  Defendant does not dispute this conclusion.

As a result of the accident, Plaintiff has been unable to return to his job aboard the Pacific Star.  He still has weakness in his left arm that limits his ability to lift some objects and do heavy tasks.  It has been recommended that he pursue an occupation that does not require him to do more than "light" or "light-medium" lifting.

## CONCLUSIONS OF LAW

Plaintiff's claim is straightforward.  He argues that Defendant's crew acted negligently in dropping the line and that their negligence caused his injuries.  In response, Defendant all but concedes the issue of primary negligence, noting only that it had no knowledge of Plaintiff's injury until this suit was filed and thus had difficulty investigating his claim.  It argues instead that Plaintiff is partially at fault—that he was standing in an unsafe location and that he failed to let go of the line as early as he could

MEMORANDUM OF DECISION - 6

have. The parties also dispute the amount of loss attributable to Defendant.

**A. Fault**

The parties do not dispute that, because Plaintiff "was injured aboard a ship upon navigable waters," federal maritime law applies. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 408 (1959). And because Plaintiff has not argued that he was an employee of Defendant, ordinary negligence principles control. Peters v. Titan Nav. Co., 857 F.2d 1342, 1344 (9th Cir. 1988).

**1. Primary Negligence**

"To recover for negligence, a plaintiff must establish [by a preponderance of the evidence]: (1) duty; (2) breach; (3) causation; and (4) damages." Samuels v. Holland Am. Line-USA Inc., 656 F.3d 948, 953 (9th Cir. 2011) (citation and internal quotation marks omitted). Plaintiff has satisfied its burden.

The duty in this case is one of reasonable care, which is "[t]he degree of care considered reasonable in a particular circumstance depends upon the 'extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger.'" Id. (quoting Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 172 (2d Cir. 1983)).

Unquestionably, Defendant breached this duty. It was undisputed at trial that industry custom and practice requires lines to be lowered down slowly and in a controlled manner specifically to avoid injuring the crew below. And though Plaintiff did not present any direct evidence of a specific act of negligence by any individual crew member, the act speaks for itself: the injury would not normally occur without wrong-doing on the Defendant's part and Defendant is uniquely positioned, to the exclusion of others, to know the circumstances that caused the Plaintiff's injury. Jones v. Williams, 297 F.3d 930, 939 (9th Cir. 2002) (Silverman, J., concurring) (explaining when a res ipsa instruction is appropriate); see Johnson v. United States, 333 U.S. 46,

MEMORANDUM OF DECISION - 7

49–50 (1948). Defendant did not offer any evidence to rebut the resulting inference of negligence. See Workman v. New York, 179 U.S. 552, 565 (1900) (stating that it "is elementary" that "under . . . general maritime law" an "an owner of an offending vessel committing a maritime tort is responsible, under the rule of respondeat superior").

Finally, there is also no dispute that the dropping of the line directly and proximately caused Plaintiff's injury. The line struck the tug one-and-a-half seconds after it fell, causing Plaintiff's left arm to be jerked violently. And though Plaintiff did not immediately seek medical attention, each of the medical doctors and experts attributed Plaintiff's injury to this violent jerk.

**2. Secondary Negligence/Comparative Fault**

The doctrine of comparative fault applies in maritime cases. Kermarec, 358 U.S. at 629. If a defendant can demonstrate by a preponderance of the evidence, that the plaintiff also acted negligently, he is entitled to a mitigation of damages. Id.

In this case, Defendant argues three circumstances of comparative fault. First, he contends that Plaintiff acted negligently in standing "under the line." He argues that Plaintiff knew not to stand under the line and that his injuries were proximately caused by his decision to stand there anyway. The Court disagrees. There is no evidence that Plaintiff was standing under the line. To the contrary, he testified that he was not standing under the line and was not struck by the line as it fell. The Court finds his testimony credible and notes that it is supported not only by Captain McKinley's account of the accident, but also by the lack of any physical evidence (like bruises) that Plaintiff was struck by the falling line. The Court thus finds that he was not standing under the line.

Defendant also argues that Plaintiff was partially at fault because he could have stood in a different location on the vessel. The Court disagrees. While Plaintiff certainly could have stood in a variety of different places aboard the deck of the Pacific

MEMORANDUM OF DECISION - 8

Star, his decision to stand just forward and to the right of the staple was not negligent. See Samuels, 656 F.3d at 953 (noting that "reasonable care" aboard ships must account for the functions of the ship itself). To the contrary, it was a location that would allow him to efficiently, yet safely, retrieve the line.

Finally, Defendant argues that Plaintiff acted negligently in failing to react quickly enough to release the line once it was dropped. At trial, Defendant's expert testified that the line would have taken approximately one-and-a-half seconds to fall from the Global Spirit to the Pacific Star. He explained that studies have shown that the average reaction time is three-tenths to one-half of a second. Allowing Plaintiff another one-tenth of a second to perceive a change in the line's speed, he concluded that Plaintiff had more than enough time to release the line and avoid being injured. Defendant contends that Plaintiff did not act in time because he was tired and distracted—that he was checking the line for defects and flaking it across the deck before it had been wholly retrieved. The Court is not convinced.

Line retrieval is no easy task. Plaintiff had to watch the line above and make sure that it was placed on deck in a safe manner. He had to make sure that the line in his hands was not on the verge of breaking, and he had to be conscious of the consequences of the line falling overboard and fouling up the tug's engines—that, as he explained at trial, the line would whip across the deck, slicing through anything and anyone in its path. Moreover, he had to do all of these things while standing on a rocking deck and attempting to communicate with other sailors. Under these circumstances, the Court could not possibly conclude that Plaintiff was negligent because he failed to assess the situation and react as fast as someone sitting comfortably in a controlled study environment who's only task is to react as quickly as possible.

MEMORANDUM OF DECISION - 9

**B. Damages**[2]

Again, Plaintiff seeks to recover economic damages, including lost past and future wages, lost benefits, the value of lost household services, future medical expenses, and retraining costs, as well as damages for his pain and suffering and prejudgment interest. The Court considers each in turn.

**1. Lost Wages**

The parties paint distinctly different pictures of the amount of lost wage damages appropriate in this case. Plaintiff argues that he would have worked on the tugs until age 65 and paints a bleak picture of his future earning potential. He asks for lost wage damages in the neighborhood of $729,600 to $794,700.[3] Defendant on the other hand contends that work-life expectancy statistics for transportation workers demonstrate that Plaintiff would not have worked continuously until age 65. It also contends that Plaintiff's work experience and documented history of being a self-motivated, model employee and small business owner will allow him to excel in his next career. It asks the Court to limit Plaintiff's lost wage damages to the area of $253,775 or $323,728.

As noted at trial, the Court finds the methodology of Defendant's expert, William Partin, to be more persuasive and in accordance with industry valuation practices than that of Plaintiff's expert.[4] Accordingly, the Court finds that any award for lost wages

---

[2] The Court recognizes that damages are more akin to findings of fact than conclusions of law. It discusses them in its conclusions of law section simply for the benefit of context.

[3] At trial, Plaintiff's expert reduced his damages calculation by an additional $31,000.

[4] For example, Plaintiff's expert explained that he was originally unaware that he should reduce losses for income tax and declined to reduce for employment uncertainty. But see Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 533 (1983) ("The lost [income] stream's length cannot be known with certainty; the worker could have been disabled or even killed in a different, non-work-related accident at any time. The probability that he would still be working at a given date is constantly diminishing."). In addition, many of the calculations contained in Plaintiff's expert's reports do not appear to be tethered to tenable assumptions or objective data. Accordingly, his figures are simply not credible. Accordingly, to the extent the Court does not deviate from the methodology and figures contained in Defendant's Exhibit

should be reduced for taxes and probability of unemployment, and adjusted for wage growth and present value. Pfeifer, 462 U.S. at 533–34. In addition, the following three considerations require greater discussion: (1) Plaintiff's work-life expectancy[5]; (2) Plaintiff's earning potential at Foss; and (3) Plaintiff's future earning potential.

As to Plaintiff's work-life expectancy, Plaintiff testified that work aboard tugs is hard and dangerous. His own history proves the physical toll of the job—injured arms and an injured back. Plaintiff's own expert, Dr. Theodore Becker, explained that Plaintiff's 2005 right arm injury would likely limit his work-life expectancy on a tug by increasing his risk of injury. Dkt. # 31-2 at 22–25. Moreover, Plaintiff also explained that he has had friends and colleagues lose limbs to loose lines and even suffer permanent mental disabilities or death from on-the-job accidents. This direct evidence supports the objective third-party statistics relied upon by Defendant to argue that Plaintiff could only have expected to work for 12.32 more years aboard tugs. If he worked those years consecutively, he would be just over the age of 61 at that point. Of course, because work-life expectancy measures cumulative years, not consecutive years, he might also have been older at the time of retirement.

On the other hand, Plaintiff testified that his pension benefit plan applies a discount to benefits paid to individuals who retire before the age of 65. Were Plaintiff to retire at 61, he believes his monthly pension checks would be reduced by 14 percent. At trial, however, it was explained that this reduction in monthly benefits is not a true penalty; it simply reflects the reality that Plaintiff would be receiving four additional years of benefits. In any case, for the reasons discussed, the Court ultimately believes

---

517, it adopts that methodology and those figures and incorporates them herein by reference.

[5] Work-life expectancy accounts for the cumulative amount of time an individual might expect to continue working. Accordingly, an individual who works for the next ten years straight and then retires would have the same work-life expectancy as someone who works for five years and then takes three years off before returning to work for five more years.

MEMORANDUM OF DECISION - 11

that the physical demands of the job—and not the particulars of his pension plan or his current desire—would be determinative of Plaintiff's work-life expectancy aboard tugs. Regardless of whether Plaintiff may currently believe he would continue working until a set age, the evidence demonstrates that he would more probably than not lack the ability to do so.[6] The Court thus finds that Plaintiff could reasonably have expected to work as a chief engineer on Foss tugs for 12.32 additional years at the time of his injury.

Moving to the second factor, the Court values Plaintiff's 2011 net earning potential at Foss at $90,256.90.[7] This figure is largely driven by overtime hours,[8] which are paid at a current hourly rate of $48.60. Over the three years prior to his accident (July 2006 through July 2009), Plaintiff worked an average of 46 overtime hours each month. Adjusting for the fact that Plaintiff's 2008 hours were inflated by the in-servicing of the Pacific Star, the Court finds that Plaintiff worked an average of 38.5 overtime hours per month, or 462 overtime hours per year, during that three-year period.

Using that three-year average as a baseline, the Court finds that it must adjust downward again to reflect the fact that Plaintiff's overtime hours had risen sharply during that three year period and do not appear sustainable. The Court must also recognize that the economic downturn likely would have limited the availability of hours. Evident of both these facts are the hours logged by Plaintiff's replacements aboard the Pacific Star after his accident. They averaged only 180 overtime hours per year. Accordingly, the Court thinks it more likely than not that Plaintiff's overtime hours

---

[6] The Court would also note that Plaintiff testified that his fellow chief engineers have tended to work less, and have less enthusiasm for work, as they approach retirement.

[7] The Court would note that the 75 percentile wage in the industry per the U.S. Bureau of Labor Statistics is $79,800.

[8] Calculating Plaintiff's losses is difficult because the availability of overtime hours fluctuated on a monthly basis. Given this uncertainty, the Court has adopted Defendant's method of measuring Plaintiff's 2011 earning potential and then adjusting for both anticipated wage growth and probability of future employment.

MEMORANDUM OF DECISION - 12

would have also decreased. Taking into account Plaintiff's individual work history, though, the Court finds that his hours would not have fallen to the level of his replacements. Rather, the Court finds that the evidence supports a finding that Plaintiff would more probably than not have worked at least 290 hours of overtime in 2011.

At current Foss wage rates, this would result in a 2011 overtime income of $14,094. Added to Plaintiff's ordinary hourly wages of $67,392 (2,080 hours at the 2011 rate of $32.40 per hour), parity wages of $2,655 (177 hours at $15.00 per hour), cooking wages of $7,078 (172 hours at $41.15 per hour), and "other wages" of $6,929, this results in an earning potential of $98,148 in present-day dollars. Reduced by 8.04 percent, the average ratio of Plaintiff's yearly unreimbursed business expenses,[9] this results in a net yearly earning potential of $90,256.90 in present-day dollars.[10]

Finally, the third disputed factor is Plaintiff's future earning capacity. Given Plaintiff's experience and work history, the Court finds that Plaintiff could work as a "Cargo and Freight Agent/Production, Planning, and Expediting Clerk" as early as October 1, 2013. In that position, the Court finds that Plaintiff could make as much as $34,060 during the remainder of 2013 and through 2014 and as much as $47,734 in his fourth full year using present day wage rates. The Court also agrees that Plaintiff would be able to work longer in this occupation than he would aboard tugs given the "light" physicality of the job—a full 14.25 years per the objective statistics. However, given Plaintiff's individual health issues, and the reality that he will not be able to start working until late 2013, the Court reduces this expectancy figure by three years, resulting in a net

---

[9] Plaintiff figures do not reduce for unreimbursed business expenses.

[10] Unlike Defendant and the Court, Plaintiff's expert relied on Plaintiff's gross income rather than wage income to calculate Plaintiff's earning potential. Yet he still independently, and additionally, calculated many of the income generators that make up the difference between gross income and wage income. This results in a vastly overstated loss amount.

MEMORANDUM OF DECISION - 13

work-life expectancy, post-retraining, of 11.25 years.[11]

Having resolved these three factors, the Court now reaches the difficult part: calculating Plaintiff's losses. In regard to lost past wages, the Court's methodology is as follows: the Court starts with Plaintiff's net 2011 Foss earning potential of $90,256.90. It then accounts for the probability of future unemployment,[12] the duration of the work period, unemployment benefits, and income tax. Pfeifer, 462 U.S. at 533 & n.10. Finally, the Court then adjusts for the fact that Plaintiff's net earning potential is calculated in terms of his 2011 anticipated income.[13] [14] Based on these calculations, the Court finds a past wage loss of $158,982.[15] Deducting the $48,239 in actual wages Plaintiff received post-accident, the Court finds a net past wage loss of $110,743.

Next, the Court turns to Plaintiff's anticipated future lost wages. Again, the Court starts with Plaintiff's net 2011 earning potential at Foss of $90,256.90. It then accounts for the probability of future unemployment, irregular work periods, unemployment benefits, and income tax. Adjusting upward for compound wage growth and reducing for present value,[16] the Court finds a net but-for future Foss wage loss of $630,469. The Court then offsets for Plaintiff's anticipated future earnings as a "Cargo and Freight Agent/Production, Planning, and Expediting Clerk." Using the figures previously described, the Court again accounts for the probability of future unemployment, irregular

---

[11] Ostensibly, if Plaintiff worked consecutively from late 2013, he would be able to retire at the end of 2024 at the age of 64.

[12] The Court used the 20-year average unemployment rate of 6.67 percent.

[13] The Court used the 20-year compound wage growth rate of 3.04 percent.

[14] Again, except otherwise described, the Court adopted the detailed methodology of Defendant's economist. Accordingly, a more detailed accounting of the Court's process can be found at Defendant's Exhibit 517, Attachment 9.

[15] The Court uses a .167 period length (two months) for 2012 rather than .10.

[16] The Court adopted the compound tax-affected discount rate of 3.61 percent.

MEMORANDUM OF DECISION - 14

work periods, unemployment benefits, and income tax before adjusting upward for compound wage growth and reducing for present value.[17] The result is a net anticipated wage income of $385,243. Accordingly, the Court finds that Plaintiff has proved a net present value future wage loss of $245,226.

In sum, the Court awards Plaintiff $355,969 in lost wages.

**2. Lost Fringe Benefits**

The Court next addresses Plaintiff's claim for lost fringe benefits, namely health insurance and retirement benefits. Unless otherwise described, it applies the same findings and methodology described above.

First, the Court finds that Plaintiff is entitled to past and future health benefit damages. In regard to past damages, Plaintiff claims only $1,181. Plaintiff's Exhibit 18, Schedule 2(a). Because Defendant concedes that Plaintiff suffered at least that much of a loss, see Defendant's Exhibit 517, Attachment 10, the Court awards Plaintiff $1,181 in past health benefit damages.

Moving on to lost future health benefits, the Court finds that Plaintiff has demonstrated future damages in a present value amount of $16,419. The Court reaches this amount by first calculating the amount of benefits Plaintiff would have received but for the accident. Per the latest union agreement, Plaintiff would have received $7,649 per year in health benefits. Accounting again for the probability of future unemployment and irregular work periods[18] before adjusting upward for compound benefit growth[19] and

---

[17] Due to the decreased tax implications of Plaintiff's alternate wages, the Court utilized a variable compound tax-affected discount rate. The applicable rates are contained at Defense Exhibit 517, Attachment 30.

[18] For example, the Court calculates 2012 at .8333 of a year given that two months have already passed.

[19] The Court agrees that the long-term statistical growth rate of 3.4 percent, combined with the U.S. Department of Labor's conclusion that employers generally provide insurance benefits of 11.23 percent of gross income, serves as a better approximation of future benefits

MEMORANDUM OF DECISION - 15

reducing for present value, the Court finds a present value loss of $68,140.

The Court then considers the demonstrated amount of offset from anticipated future health benefits. According to U.S. Bureau of Labor Statistics, employers generally provide insurance benefits at a rate of 11.23 percent of gross income. Thus, using the anticipated income figures discussed previously, and accounting for the probability of future unemployment and irregular work periods before adjusting upward for compound wage growth and reducing for present value, the Court finds that Plaintiff could more likely than not expect to receive $51,721 in future health benefits over the life of his next career. This results in a net present value loss of future health benefits in the amount of $16,419. The Court awards this amount to Plaintiff.

Moving on to retirement benefits, <u>the Court finds first that Plaintiff suffered a past loss of $1,061 in pension benefits</u>. Plaintiff's union agreement provides for $6,353 in annual benefits, and Plaintiff had continued to receive his benefits through 2011. According, the Court need only account for two months of unpaid benefits.

In regard to future benefits, the Court calculates Plaintiff's anticipated future loss of Foss benefits by adjusting the current union negotiated rate of $6,353 for the probability of future unemployment and irregular work periods before adjusting upward for compound wage growth and reducing for present value. This results in a present value loss of $53,780. Contrary to Plaintiff's assertion, however, that does not end the Court's inquiry.

The Court agrees with Defendant that Plaintiff can expect to receive retirement benefits in his alternate career.[20] Per the U.S. Department of Labor, employers generally provide retirement benefits in an amount of 5.79 percent of gross wages. Thus, again,

---

than Plaintiff's use of a pure 7.9 percent compound growth rate. Use of Plaintiff's rate would require the Court to find that Foss would pay more than three times as much in health benefits per employee in 2024 than it did in 2011—an extreme proposition.

[20] Plaintiff's figures assume no retirement benefits.

MEMORANDUM OF DECISION - 16

using the anticipated income figures discussed previously, the Court accounts for the probability of future unemployment and irregular work periods before adjusting upward for compound wage growth and downward for present value. The result is an anticipated present value offset of $26,666. Accordingly, <u>the Court finds that Plaintiff has demonstrated a net present value loss of future retirement benefits in the amount of $27,114</u>. The Court awards Plaintiff that amount in damages.

In sum, the Court awards Plaintiff $45,775 in lost fringe benefit damages.

### 3. Lost Value of Household Services

The Court next considers Plaintiff's claim for damages for the lost value of his household services. At trial, Plaintiff explained that he now has difficulty doing many household chores, like mowing his lawn, cleaning his house, and working on his cars. He requests $7,041 in past damages for services and $31,529 for the present value of future services. In response, Defendant argues that Plaintiff is entitled only to $3,487 in past damages but $34,640 in future damages. In sum, the parties differ by only $443.

At trial, Plaintiff's occupational expert testified that he would need an average of two hours of household services labor per week. She valued this labor at $30 per hour. Notably, Defendant agrees that Plaintiff is entitled to eight hours per month of services. It presented evidence, however, that the average current hourly rate for household labor in Plaintiff's county is $13.22 per Washington statistics and $15.02 with related taxes and fees. Defendant's Exhibit 517, Attachment 26. In response, Plaintiff asserted only his personal experience of encountering a higher hourly rate for automobile repair.

The Court finds Defendant's statistics persuasive, but agrees that the baseline hourly rate should ideally be adjusted slightly higher to account for the cost of automobile repair. Unfortunately, Defendant has provided no extrinsic evidence as to the average cost of automobile repair or, more importantly, the frequency with which he might expect to utilize such services in the future in contrast to his previous use. Due to

MEMORANDUM OF DECISION - 17

this failure of proof, the Court is left only with Defendant's statistical data. The Court thus uses the baseline amount of $15.02 per hour to reach a current annual anticipated cost of $1,441.92 and relies on data from the Washington State Office of the Insurance Commissioner to affix Plaintiff's life expectancy at 29.25 years from the date of the accident.

The next step is to distinguish past damages from anticipated future damages. In regard to past damages, the Court starts from the baseline current anticipated cost of $1,441.92 and adjusts for irregular yearly periods[21] and wage growth. <u>This results in a net past services loss of $3,584</u>. Turning to future losses, the Court does much of the same, but also adjusts for present value. Totaling these calculations,<u> the Court finds a net present value future loss of $34,542</u>.

Thus, the Court awards Plaintiff $3,584 in past damages and $34,542 in future damages for loss of household services.

### 4. Future Medical Expenses

Plaintiff seeks only $4,250 in damages to allow him to continue to receive mental health counseling for his job-related anxiety and his frustrations about his recovery. The Court finds Plaintiff's request to be reasonable and supported by the totality of the evidence in this case. It awards him $4,250.[22]

### 5. Retraining Costs

The parties agreed that Plaintiff would need to undergo at least one year of training to obtain a position as a "Cargo and Freight Agent/Production, Planning, and Expediting Clerk." Plaintiff's expert testified that such retraining can generally be obtained at local community colleges at a present cost of $6,000. Defendant's expert

---

[21] For example, Plaintiff would only be entitled to damages for a portion of 2009 (.36) and 2012 (.167).

[22] The Court also finds that there would be no material difference between the net present value of the cost of counseling and the anticipated growth in counseling costs.

MEMORANDUM OF DECISION - 18

opined that the overall cost could likely reach as high as $8,000. The evidence also demonstrated that at least two community colleges within easy driving distance of Plaintiff's home offer the required program. The Court thus awards Plaintiff $8,000 in retraining costs.

### 6 General Damages

In regard to general damages, which includes damages for Plaintiff's physical and mental pain and suffering, the Court finds that Plaintiff has demonstrated entitlement to $50,000 for his past pain and suffering and $50,000 for his future pain and suffering.[23]

Plaintiff had to endure the pain of the accident, two surgeries, and months of physical therapy. At trial, he described a constant ache in his left arm and described the many ways in which his injury affects his life to this day. He sleeps fitfully, rarely sleeping for more than two or three hours at a time. He cannot drive long distances. He is guarded about physical contact, which inhibits his ability to play with his children and grandchildren. Moreover, his arm weakness limits his ability to do many of the activities he used to enjoy, like working on cars, hunting, fishing, and crabbing. And Plaintiff has endured the anxiety and frustration that naturally result from being injured and put in a position of uncertainty as to how to provide for himself and his family.

The Court does, however, draw a line between such ordinary anxiety and Plaintiff's claim that he now suffers from post traumatic stress disorder and should be compensated accordingly. The only evidence of post traumatic stress is the diagnosis of Dr. Suzanne Best, and the Court specifically finds her testimony to lack credibility. For example, her statement that, at the time of the incident, Plaintiff "was terrified that he had severed his arm and had thought he was actually going to die," is completely unfounded. Her description of the accident and Plaintiff's immediate reaction is not

---

[23] The Court has already taken into account the need to reduce Plaintiff's award for future pain and suffering to present value.

MEMORANDUM OF DECISION - 19

supported by any of the evidence, including Plaintiff's own account. And, because that account forms the basis of her diagnosis, the Court cannot credit it. With no other evidence in the record to distinguish Plaintiff's general melancholiness from a more serious diagnosis, the Court must reject that aspect of Plaintiff's claim.

**7 Pre-Judgment Interest**

Pursuant to 28 U.S.C. § 1961, the Court awards pre-judgment interest. The parties are directed to file a joint brief that discusses the appropriate measure of interest given the Court's findings as to damages within 30 days of the date of this memorandum.

### III. CONCLUSION

For all of the foregoing reasons, the Court finds that Defendant's negligence was the sole cause of Plaintiff's permanent injury. It awards Plaintiff $355,969 in lost wage damages, $45,775 in lost fringe benefit damages, $38,126 in lost services damages, $4,250 in future medical expenses, $8,000 in damages for retraining costs, and $100,000 in damages for his pain and suffering. This results in a net judgment to Plaintiff in the amount of $552,120. The Court further directs the parties to file simultaneous briefs on the issue of pre-judgment interest within 30 days of the date of this memorandum.[24]

DATED this 9th day of March, 2012.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

---

[24] The Court would ask the parties to meet and confer prior to filing their briefs to attempt to reach a consensus.

MEMORANDUM OF DECISION - 20